UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Cause No. 1:06-CR-23-HAB |
| ) | |
| MARLYN J. BARNES ) | |

**OPINION AND ORDER**

Defendant was convicted by a jury in 2008 of crimes arising out of his participation in a so called "fake stash house sting." He now moves for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A)(i), arguing that extraordinary and compelling reasons exist for his immediate release. The motion has been fully briefed (ECF Nos. 720-1, 731, 734) and is ripe for ruling.[1]

**I.    Factual and Procedural History**

**A.    *Defendant's Crime of Conviction***

Sometime in the mid-aughts the ATF began to investigate Defendant arising out of his connections with the Vice Lords gang in Gary, Indiana. The ATF received information that Defendant and other Vice Lords were operating in Fort Wayne, Indiana, collecting drug debts through violence and planning business robberies. Defendant was operating in Fort Wayne because of a "situation" in Gary that required his relocation.

As is almost always the case, one of Defendant's criminal compatriots was a confidential informant ("CI") for the Government. Defendant and the CI bought and sold drugs from one another, went on drug-related road trips, and, one time, Defendant delivered a kilogram of cocaine to Chicago for the CI. Because of these activities, Defendant was aware of the CI's drug

---

[1] Defendant has also requested oral argument. (ECF No. 735). Because of the extensive and well-written briefing, the Court sees no reason to hold oral argument.

organization. Defendant knew that the CI's cocaine source was a drug trafficker from Texas named Oodle. Defendant also knew that the organization had recently lost forty (40) kilograms of cocaine.

At some point in 2006, Defendant developed a plan to rob a stash house in Kimmell, Indiana, used by a Mexican cartel. The ATF learned about this plan through the CI. To dissuade Defendant from this plan, the ATF decided to present Defendant "with an alternative opportunity based on the CI's actual drug organization." (ECF No. 731 at 3). The CI introduced Defendant to an undercover ATF agent ("UC") posing as a courier for the CI's drug organization. The UC told Defendant that he was willing to compromise the organization's Indiana stash house so that Defendant could conduct an armed robbery of the location. The UC promised to give Defendant the location of the house so long as Defendant performed the robbery in such a way as not to implicate the UC.

The ATF recorded many of the planning meetings for the robbery. Those recording do not reflect well on Defendant. Defendant discussed shooting people during the robbery, including the UC and any armed guards who might be at the stash house. He discussed kidnapping Oodle's nephew and holding him ransom for one hundred kilograms of cocaine. If the ransom was not paid, Defendant said he would send Oodle his nephew's severed fingers. Defendant also planned to distribute the entire stolen drug load, proving knowledge of drug pricing and lingo.

Throughout these recordings, Defendant made clear that he and his crew were eager to carry out the robbery. He described his crew as "America's Most Wanted type motherfuckers" from the "murder capital of the whole world." Defendant stated that they would bring assault rifles for the robbery, ensuring that the guards would drop their guns when the first guy got hit with a round from an AK-style rifle. Defendant assured the UC that any guard that reached for a firearm during the robbery would die.

In early-May 2006, Defendant and his crew[2] travelled to Fort Wayne to make final preparations for the robbery. The final planning meeting was recorded by the ATF. The UC told the men that the CI and Oodle's nephew were bringing the drug load to Fort Wayne the next morning. Defendant and his crew participated in the meeting, asking about the number of armed guards and their expected weaponry, among other topics. Defendant and his crew affirmed that they had firearms ready to go, but asked the UC for gloves and duct tape. Before departing, the UC gave all the men a chance to back out with no questions asked—no one took him up on the offer.

The UC eventually left the meeting, at which time Defendant and his crew held their own meetings to review the plans. Individual roles were discussed. Defendant tested one of the bullet-proof vests by shooting it. One of the crew members advised that he wanted to spray gunfire at the guards upon entering the home. The men eventually settled on a plan where Defendant and one other crew member would enter the stash house with assault rifles and bullet-proof vests to conduct the robbery.

The next morning, Defendant and his crew exited the hotel where they had been staying ready to conduct the robbery. Defendant carried a duffel bag with assault rifles and vests. He placed the bag into the trunk of an undercover vehicle, where the UC had put the requested gloves and duct tape. The men then traveled to a storage unit where they planned to pick up a van that would be used to transport the stolen cocaine. Preparations for the robbery continued at the storage unit, where Defendant and his crew decided that they would carjack the UC to steal another drug load headed for Ohio.

---

[2] The Government notes that, other than Defendant and possibly his brother, the ATF did not know who would be in Defendant's crew, and that the ATF gave Defendant no direction on who to recruit to the scheme.

Alas, it was not to be. The ATF arrested Defendant and four members of his crew at the storage unit, with another crew member arrested soon after. In total, the men had four firearms and 204 rounds of ammunition.

Defendant was charged with conspiracy to possess 5 kilograms or more of cocaine with intent to distribute and carrying a firearm in relation to a drug trafficking crime. He was convicted on both counts following a jury trial, but not before, at least according to the Government, he perjured himself at the trial of a co-Defendant. The Court sentenced Defendant to 352 months' imprisonment and five years of supervised release. His sentence, but not conviction, was reversed on appeal and remanded for clarification on the drug quantity. On remand, the Court handed down the same sentence.

Defendant filed for habeas relief in 2012, which, along with several motions for reconsideration, were denied. That said, Defendant's sentence was reduced under the First Step Act in 2015. The reduced sentence was 294 months' imprisonment. Defendant is projected to be released in July 2027.

**II.    Legal Discussion**

**A.    *Compassionate Release Standard***

Defendant's motion requests compassionate release. Generally, a court is statutorily prohibited from modifying a term of imprisonment once imposed. *See* 18 U.S.C. § 3582(c). A handful of statutory exceptions exist, however, one of which allows a court to grant an inmate compassionate release if the inmate meets certain requirements. *See* 18 U.S.C. § 3582(c)(1)(A). Under this provision, a court may not modify a term of imprisonment except that –

> (1) in any case --
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to

>appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, . . . finds that—
>
>(i) extraordinary and compelling reasons warrant such a reduction …
>
>… and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

Because Defendant, not the Director of the BOP, filed the motion, Defendant must first show that he has satisfied the statutory exhaustion requirement. The Government concedes that Defendant has properly exhausted his remedies. (ECF No. 731 at 11).

Congress did not define "extraordinary and compelling reasons" in the statute, instead delegating the matter to the Sentencing Commission to promulgate a policy statement that "describe[s] what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). The policy statement, in United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13 and the accompanying Application Notes, have not been amended to reflect the First Step Act's change to § 3582(c)(1)(A) allowing prisoners to bring compassionate release claims directly. *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020)[3]. As a result, "§ 1B1.13 and its application notes provide useful – but not binding – guidance to courts in determining whether a defendant has identified an extraordinary and compelling reason for compassionate release." *United States v. Hoskins*, No. 2:99 CR 117, 2020 WL 7640408, at *2 (N.D. Ind. Dec. 23, 2020) (citing *Gunn*, 938

---

[3] Yet as *Gunn* made clear, the Guidelines' requirement that the court consider whether the reduction is otherwise "consistent with this policy statement" does not limit a district judge's discretion. This is because the statute by which the district court is bound requires a reduction to track "applicable policy statements." And the Sentencing Commission has not yet issued a policy statement "applicable" to Defendant's request. Thus, *Gunn* held, "[a]ny decision is 'consistent with' a nonexistent policy statement." *Gunn*, 980 F.3d at 1180

5

F.3d at 1180). Indeed, "[d]istrict judges must operate under the statutory criteria–'extraordinary and compelling reasons'–subject to deferential appellate review." *Gunn,* 980 F.3d at 1181.

Using the guidance of §1B1.13 to inform the statutory criteria, the court considers the medical condition of the defendant, his age, his family circumstances, and whether there is in the defendant's case an extraordinary or compelling reason "other than or in combination with" the other reasons described in the Application Notes. Second, the Court determines whether the defendant is "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). Finally, the Court considers the § 3553(a) factors, "to the extent they are applicable." U.S.S.G. § 1B1.13.

**B.**   ***Defendant Cannot Show Extraordinary and Compelling Reasons for Release***

Defendant puts forth two reasons that he believes are extraordinary and compelling, entitling him to compassionate release. Defendant first argues that his "family needs him at home to help care for his youngest daughter." (ECF No. 720-1 at 15). Defendant then argues that his "sentence is unreasonably long." (*Id.* at 17). Neither reason is extraordinary and compelling as those words are used in the context of compassionate release.

**1.**   *Defendant's Family Circumstances do not Support Compassionate Release*

The sad fact is that incarceration often affects an offender's family as much as the offender. This case is a prime example. Shortly before his arrest, Defendant had a daughter ("Daughter"). The Daughter, now 16, is developmentally disabled, functioning at the level of a four-year-old. The Daughter's mother, Erica DeLucenay ("Erica"), has been caring for the Daughter since Defendant's incarceration. This situation had adequately cared for the Daughter's needs until recently. The change in Erica's situation is what undergirds the compassionate release argument.

In the past, Erica had relied on the help of her mother and father to take care of the Daughter. She can no longer rely on that assistance. Erica's father's health is deteriorating, and her mother must care for her husband. None of Erica's or Defendant's other family members can help care for the Daughter, as she lives in Michigan and the remaining family lives in Indiana.

Application Note 1 to U.S.S.G. § 1B1.13 sets out the circumstances that amount to extraordinary and compelling reasons. Relevant to this argument, subpart (C) states:

<(C) Family Circumstances.-->

> <(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.>
>
> <(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.>

U.S.S.G. § 1B1.13, cmt., app. note 1(C). To fall within the Application Note, Defendant would need to show that the caregiver for the Daughter, that being Erica, is dead or incapacitated. Neither is true.

Defendant seemingly understands that, under the Application Note, his family circumstances argument is a non-starter. He argues that, under *Gunn*, the Court is not bound by the categories set forth by the Sentencing Commission. Rather, he asserts that "district courts are free to make that determination on their own for any reason the court deems 'extraordinary and compelling.'" (ECF No. 720-1 at 14). This much is true; Section 1B1.13 is not binding on the Court. *United States v. Rucker*, 27 F.4th 560, 562 (7th Cir. 2022). But it must be said, the Seventh Circuit has consistently affirmed district courts that use the Guidelines as a roadmap for making the compassionate release decision. *Id.*; *United States v. Kurzynowski*, 17 F.4th 756, 760 (7th Cir. 2021). And the discretion afforded by *Gunn* is not unfettered—it only "goes so far." *United States v. Thacker*, 4 F.4th 569, 573 (7th Cir. 2021).

No matter the extent of the Court's discretion, the circumstances put forth by Defendant are not enough. The Court first notes that Defendant has not identified a single case, from any federal court in any jurisdiction, that has found inconvenience, rather than the death or incapacitation of a non-incarcerated caregiver, to constitute extraordinary and compelling circumstances. Indeed, many courts hold otherwise. *See*, *e.g.*, *United States v. Nazer*, 458 F. Supp. 3d 967, 973 (N.D. Ill. 2020) (increase in wife's work schedule brought on by pandemic, making it difficult for her to care for school-aged children, not an extraordinary and compelling reason); *United States v. Rodriguez*, 2:18-CR-145, 2020 WL 5627451, at *2 (N.D. Ind. Sept. 21, 2020) (illness to mother of defendant's children, one of which had special needs, not an extraordinary or compelling reason); *United States v. Cundiff*, 4:18-CR-08, 2021 WL 1854785, at *3 (S.D. Ind. May 10, 2021) (desire to provide childcare while wife, who was a nurse, worked not an extraordinary and compelling reason); *United States v. Timm*, 13-CR-236, 2021 WL 1515483, at *2 (E.D. Wis. Apr. 16, 2021) (wife's need for childcare while she worked as a nurse during the pandemic not an extraordinary and compelling reason); *United States v. Jones*, 2:18-CR-137, 2020 WL 3969913, at *3 (N.D. Ind. June 14, 2020) (ex-wife's need for defendant's assistance in caring for disabled adult child not an extraordinary or compelling reason). This Court is not willing to depart from the sound reasoning of its sister courts.

Even without this weight of authority, there is nothing extraordinary or compelling about Defendant's situation. Defendant's family is not the only one with a disabled child. According to the most recent government data, 4.3% of all children, and 5.1% of African American children, are identified as having a disability in the United States. United States Census Bureau, Childhood Disability in the United States: 2019 (2021). Other sources put the number of special needs children in the United States as high as 11.2 million, with one in five households caring for a

special needs child. Carmen Caicedo, *Families with special needs children: family health, functioning, and care burden*, J Am Psychiatr Nurses Assoc., Nov-Dec 2014; 20(6): 398-407. Caregivers for all these children must make daily sacrifices to ensure that the necessary care and support is provided. Defendant's family, then, is just one of many that falls under the same unfortunate statistic.

The Court is also not convinced that releasing Defendant is the best solution to his family's problems. Erica's declaration paints a difficult, but not impossible, situation. Erica has no job outside the home. She has help from family members: "a few hours a week" from her mother and some, but not much, help from her husband. Defendant, then, would not so much provide necessary childcare as he would, in the Daughter's grandfather's words, "take a lot of stress off" the family. (ECF No. 720-12 at 3; *see also* No. 720-11 at 4 (stating that Defendant "would be able to give [Erica] breaks")). A laudable goal, but not an extraordinary or compelling reason for release.

In addition, the Court cannot find that Defendant can more readily care for the Daughter than members of his own family. Defendant argues that his family members "lack the time, resources, proximity, and medical training to contribute to his youngest child's care." (ECF No. 734). That may be, but Defendant is incarcerated in a federal prison. Asking a member of Defendant's family to relocate to care for a family member is a significant request, but so is asking that Defendant be released five years early to do the same. Many families must take up the slack caused by incarceration, but the burden that incarceration causes is not a reason that justifies release. *Timm*, 2021 WL 1515483, at *2.

The simple fact is that the Daughter is being cared for. That care comes at a physical and mental price for Erica, but it is provided all the same. This Court cannot conclude that easing

Erica's burden is the kind of extraordinary and compelling circumstance that Congress envisioned when it passed the First Step Act.

**2.**     *Defendant's Sentence is not an Extraordinary or Compelling Reason for Release*

Besides his family circumstances, Defendant argues that "the circumstances of [his] offense conduct, arrest, and sentencing" are extraordinary and compelling reasons for release. He asserts that the Government's use of a fake stash house, coupled with the exceptionally long sentence he received, justify compassionate release now. The Court cannot agree.

The first issue that must be addressed is whether Defendant's argument conflicts with *Thacker*. In *Thacker*, the issue before the court of appeals was whether sentencing disparity created by a non-retroactive section of the First Step Act, Section 403[4], could serve as extraordinary and compelling circumstances supporting compassionate release. Ross Thacker ("Thacker") was sentenced in 2002 to a mandatory minimum 32-year sentence for two convictions under 18 U.S.C. § 924(c), 7 years for the first conviction and 25 years for the second. Following the enactment of the First Step Act, the mandatory minimum sentence for each conviction was reduced to 7 years. Thacker argued that the resulting 18-year disparity, along with his health conditions, satisfied the extraordinary and compelling requirement. *Id*. at 571–72.

The Seventh Circuit rejected the defendant's argument. Comparing Sections 403 and 404, the court of appeals determined that Congress made a "deliberate" choice to apply relief under Section 403 prospectively. *Id*. at 573. The court of appeals recognized that § 3852(c)(1)(A) affords district courts with discretion to shorten terms of imprisonment but made clear that this discretion "only goes so far." *Id*. at 574. The limit of that discretion, according to the court of appeals, was

---

[4] Section 403 contains the same non-retroactivity language as Section 401(c).

using the compassionate release statute to "upend the clear and precise limitation Congress imposed on the effective date of the First Step Act's amendment to § 924(c)." *Id*.

Predicting the precise issue before the Court, the Seventh Circuit later observed:

> We harbor broader concerns with allowing § 3582(c)(1)(A) to serve as the authority for relief from mandatory minimum sentences prescribed by Congress. We see nothing preventing the next inmate serving a mandatory minimum sentence under some other federal statute from requesting a sentencing reduction in the name of compassionate release on the basis that the prescribed sentence is too long, rests on a misguided view of the purposes of sentencing, reflects an outdated legislative choice by Congress, and the like. Rationales along those lines cannot supply an extraordinary and compelling reason to reduce a lawful sentence whose term Congress enacted, and the President signed, into law. Any other conclusion offends principles of separation of powers.

*Id*.

The court of appeals did not prohibit district courts from ever considering changes in sentencing as part of the compassionate release analysis. Rather, the court expressly endorsed consideration of Section 403 when weighing the § 3553(a) factors, but only after the district court first finds extraordinary and compelling circumstances. *Id*. at 575–76 (citing *United States v. Black*, 999 F.3d 1071 (7th Cir. 2021)). Still, the court of appeals made it clear that the required extraordinary and compelling reason supporting compassionate release "cannot include, whether alone or in combination with other factors, consideration of the First Step Act's amendment to § 924(c)." *Thacker*, 4 F.4th at 576.

Defendant argues that *Thacker* does not apply "because [his] arguments do not take issue with the statute or the length of the sentence that Congress prescribed for a certain crime; rather they focus on the government's problematic reverse sting operation, discretionary charging decisions, and sentencing disparities." (ECF No. 734 at 10). Defendant bolsters this argument by citing cases where compassionate release has been granted based on sentencing post-*Thacker* as well as the legislative history of the First Step Act.

11

The Court is unmoved by Defendant's authorities. First, this is not a situation in which legislative history is relevant. "Resort to the legislative history, however, is only necessary if the language of the statute is ambiguous; if the statutory language is clear, then the legislative history is only relevant if it shows a clear intent to the contrary." *Five Points Rd. Joint Venture v. Johanns*, 542 F.3d 1121, 1128 (7th Cir. 2008). Here, there is no ambiguity in the First Step Act that requires resort to the legislative history. Nor, frankly, is there any misunderstanding about the purpose of the Act. Everyone can agree that the purpose of the First Step Act, at least in part, was to expand the use of compassionate release. But that has little relevance in determining whether binding authority applies here.

Defendant's case law does little more. The decision in *United States v. Liscano*, 02 CR 719-16, 2021 WL 4413320 (N.D. Ill. Sept. 27, 2021) has been expressly disavowed by the Seventh Circuit. *See United States v. Bock*, No. 22-1148, --- F.4th ---, at *6 (7th Cir. 2022). The decisions in *United States v. White*, 2021 WL 3418854 (N.D. Ill. Aug. 5, 2021), and *United States v. Conley*, 2021 WL 825669 (N.D. Ill. Mar. 4, 2021), both fail to recognize that *Thacker* exists. The Court sees little reason to join in with cases that contradict, and even ignore, controlling precedent.

As the Court reads *Thacker*, Defendant may not raise, as extraordinary and compelling reasons, "that the prescribed sentence is too long, rests on a misguided view of the purposes of sentencing, reflects an outdated legislative choice by Congress, and the like." *Thacker*, 4 F.4th at 574. That is, Defendant's sentence may not, "whether alone or in combination with other factors," be considered in the Court's extraordinary and compelling reasons analysis. *Id*. at 576. Because that is precisely what Defendant asks this Court to do, his request is contrary to *Thacker*.

But even if the Court is wrong, and *Thacker* does not apply, Defendant has not shown that his sentence is an extraordinary and compelling reason for release. Defendant's primary argument

12

focuses on what he claims are sentencing disparities between himself and other fake stash house defendants. But this argument has already been addressed, adversely to Defendant, on his § 2255 petition. There, Judge Springmann wrote:

> Although he cites cases from other courts for this Court to compare with his own sentence, he does not attempt to identify the nuances of the conduct involved in those cases or the background of the particular defendants. Neither does he address the factors that affected his own sentence, such as his commission of perjury at trial, his role in the offense as a leader and organizer, or his failure to accept responsibility or to cooperate. In fact, a review of those comparator cases reveals that the disparities between sentences was not "unwarranted."

(ECF No. 595 at 13). Her critiques are as on-point today as they were in 2013.

Take *Conley*, for instance. There, Tracy Conley was not involved in the fake stash house plot until the day of his arrest. And he only attended a meeting of the conspirators because of a "happenstance meeting"; he had agreed to clean the apartment of one of the conspirators in exchange for gas money. *Conley*, 2021 WL 825669, at *1. Similarly, in *White*, the defendant was not involved until the day of his arrest and, at least according to one witness, was never given the specifics of the plan. *White*, 2021 WL 3418854, at *1[5]. Even if those courts were correct in their compassionate release decisions, the facts of those cases do little to lead this Court to the conclusion that Defendant's sentence is problematic.

Comparisons aside, Defendant's fake stash house argument fails for a more fundamental reason. To the extent that the Court is troubled by this investigation tactic, it is in the Government's ability to name a sentence by creating the drug weight. A CI or UC can say that the stash house has 5 kg, 10 kg, or 100 kg (because, after all, they are making up the story), wildly affecting a

---

[5] Defendant also notes that the ringleader in *White*, Leslie Mayfield, was sentenced to less than ten years. But unlike Defendant, Mayfield was not charged with a drug crime. Instead, he was charged with a single count of conspiracy to commit robbery due to "new policies" at the United States Attorney's Office that were developed while Mayfield successfully appealed his conviction. *Id*. at *2. Mayfield's sentence, then, does little to inform this Court's analysis.

13

target's base offense level under U.S.S.G. § 2D1.1(c). In some cases, then, it is an agent's imagination, rather than the defendant's actions, that drives the eventual sentence.

The Court's concerns do not arise here. The UC and CI gave little guidance to Defendant and his crew about the drug amount. Defendant filled that vacuum with significant amounts of drugs. As noted by Judge Springmann,

> Audiotapes of meetings between the Defendant and the undercover agent and confidential informant capture the Defendant making assumptions about the quantity of drugs involved ranging from 20 kilograms to 80 kilograms. For example, after the Defendant had assembled a crew of four others and his brother, he bragged to the confidential informant and the undercover agent that with 20 kilograms, he and his brother could run the city (Gary). Codefendants testified that they understood that the load could be as much as 40 kilograms of cocaine. For example, Codefendant Armstead testified that before going to Fort Wayne, he understood the plan to be a "lifetime deal" involving about 40 kilograms of cocaine. Codefendant Hightower likewise testified that the Defendant told him that the plan was to rob 50 kilograms of cocaine from a stash house in Fort Wayne.

(ECF No. 595 at 10-11). The stipulation reached by Defendant and the Government, that Defendant's sentencing would be based on a drug amount between 5 and 15 kilograms, is conservative given this evidence. Defendant's sentence was not driven by the UC and CI's imaginations, but by Defendant's own statements.

Defendant received a significant sentence, but he was planning a significant crime. He was ready to steal up to 80 kgs of cocaine, and willing to kill to do it. These facts set him apart from his proposed comparator offenders and aggravate his conduct beyond the normal fake stash house target. The Court finds no reason to categorize his sentence as an extraordinary and compelling reason for compassionate release.

**3.** *Defendant's Reasons are not Extraordinary or Compelling Alone or in Combination*

As discussed above, neither Defendant's family circumstances nor sentence are extraordinary or compelling on their own. The Court has considered the reasons together and finds them no more worthy of compassionate release. *United States v. Newton*, 996 F.3d 485, 489 (7th Cir. 2021) (finding that proposed extraordinary and compelling reasons must be considered cumulatively). Unlike comorbidities, Defendant's proposed reasons do not interact in a synergistic fashion where the whole is greater than the sum of its parts. Instead, the reasons are separate, with neither particularly close to meeting the statutory requirements. The Court finds no extraordinary or compelling circumstances supporting release so Defendant's motion must be denied.

**C.** *The § 3553(a) Factors do not Support Release*

Finding no extraordinary or compelling reasons for release, the Court need not consider the § 3553(a) factors. *United States v. Ugbah*, 4 F.4th 595, 598 (7th Cir. 2021). But for the sake of completeness the Court finds that those factors do not support Defendant's release. This is true even if Defendant could show extraordinary or compelling reasons for release.

Section 3553(a) requires that a court imposing a just sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from future crimes by the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2). To those ends, a court must consider these factors:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; ...

15

  (3) the kinds of sentence available;

  (4) the kinds of sentence and the sentencing range established [under the Sentencing Guidelines];

  (5) any pertinent policy statement [in the Sentencing Guidelines];

  (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

  (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7). The Court need only consider the applicable factors; consideration of one factor may show that the others do not matter. *Ugbah*, 4 F.4th at 598.

  Defendant focuses mainly on the first factor, so the Court will do the same. Addressing the nature and circumstances of the crime, Defendant focuses almost entirely on the "disreputable" and "tawdry" practice of fake stash house investigations. (ECF No. 720-1 at 20-21). In doing so, Defendant ignores the nature and circumstances of *his* offense.[6] This is because the facts here are aggravating. Even if the Court discounted the testimony that Defendant intended to rob a different, real stash house, his conduct on the fake stash house is troubling. Defendant was not content to simply rob the stash house for whatever was inside. Instead, he planned to expand the operation to kidnapping and drug distribution. He recruited gang members who were willing to commit violence, including murder. He obtained a small arsenal for the job, including assault rifles, bullet-proof vests, and more than two hundred rounds of ammunition. Barnes was not some unwitting dupe. Rather, he showed himself to be an individual happy to pull off a violent robbery with very little encouragement.

  Defendant's characteristics and history do little to move the needle. Defendant notes his pre-arrest conduct, but this was considered by Judge Springmann when she sentenced him,

---

[6] As the Government notes, there is no criticism of the fake stash house tactic in Defendant's appellate decisions. *United States v. Barnes*, 660 F.3d 1000 (7th Cir. 2011); *United States v. Barnes*, 602 F.3d 790 (7th Cir. 2010);

resentenced him, and resentenced him again.[7] Aside from that, Defendant notes his rehabilitation while in jail, listing the educational and vocational opportunities he has seized on while incarcerated. Defendant is to be congratulated for doing more than just waiting out his time, but rehabilitation is one of the goals of imprisonment, not a basis for release. 28 U.S.C. § 994(t).

Defendant views his "minimal disciplinary history" as a positive, but the Court finds that it cuts both ways. The disciplinary events during Defendant's incarceration are not so numerous or significant, but they exist. The Court believes that it can expect more than a below-average number of disciplinary actions for someone requesting the exceptional relief of compassionate release.

But the incidents also show a pattern. Consider the most recent offense. Defendant's fiancée and son stopped by a location where Defendant was working a landscaping detail. Despite knowing that speaking to them "was against the rules," Defendant did it anyway because his son "was having problems." (ECF No. 720-1 at 23). This sounds an awful lot like his rationale for his underlying offense. Defendant's explanation for the stash house offense is, essentially, that he needed money to support his children. (ECF No. 734 at 13). What Defendant seemingly fails to repeatedly comprehend is that altruism is not a reason to violate the law. Many people face financial hardship, and many parents must address the needs of their children. Yet few of those people break the law in response to these common concerns, and even fewer mastermind a violent, murder-hungry plot to rob drug dealers as a solution for life's problems. What law will Defendant break the next time he faces adversity? The Court is in no hurry to find out.

---

[7] The Court is also reinforced in its decision by the repeated, significant sentences handed down by Judge Springmann. Isaac Charles Parker, famously "Hanging Judge" Parker, she was not. Judge Springmann was known, and is known, for careful consideration of each case in reaching fair sentencing decisions. She had the chance to view Defendant during his trial and the trials of his co-defendants. That she chose to sentence Defendant to nearly 300 months is extraordinary and worthy of deference.

17

As the Court found when it ruled on Defendant's last compassionate release request, the sentence he received "was imposed to reflect the seriousness of the offense, promote respect for the law as well as to afford adequate deterrence and to protect the public from further crimes of the defendant. The Court finds that the significant sentence reduction that Defendant seeks would greatly undermine the above statutory purposes of sentencing." (ECF No. 711 at 6). Nothing in the recent briefing, or the intervening facts, changes that conclusion.

### III. Conclusion

For these reasons, Defendant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) (ECF No. 720) and his Request for Oral Argument (ECF No. 735) are DENIED.

SO ORDERED on July 13, 2022.

       s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT